Filed 3/13/13  P. v. Uribe CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053314 |
| v. | (Super.Ct.No. RIF123822) |
| DAVID RUBEN URIBE et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Craig Riemer, Judge.

Affirmed in part; reversed in part.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant David Ruben Uribe.

Eric Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant Nathan Lee Lucero.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted David Uribe and Nathan Lucero of active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a))[1] and first degree murder (§ 187, subd. (a)), finding that the latter was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)), that a principal violated section 186.22, subdivision (b) and a principal personally discharged a firearm causing death (§ 12022.53, subd. (e)), that the victim was a witness to a crime and was intentionally killed in retaliation for his testimony (§ 190.2, subd. (a)(10)), that the victim was killed by means of lying in wait (§ 190.2, subd. (a)(15)) and that the victim was killed while defendants were active participants in a criminal street gang (§ 190.2, subd. (a)(22)).  Both were sentenced to prison for life without the possibility of parole, plus 25 years to life.  Defendants appeal, contending the victim's statements should not have been admitted as dying declarations and the evidence is insufficient to support a premeditation and deliberation theory of first degree murder, the retaliation special circumstance, the lying-in-wait theory of first degree murder, the lying-in-wait special circumstance, the gang substantive offense, the two gang enhancements and the gang special circumstance.  We agree with defendants that insufficient evidence supports the gang substantive offense, the gang enhancements and the gang special circumstance.  Therefore, we reverse those and the stayed sentences for the substantive offense.  If the People elect not to retry defendants for the gang enhancements or if the trial court determines that retrial is barred, we will strike the

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

stayed sentences for the section 186.22, subdivision (b) enhancements and strike the 25 years-to-life sentences for the section 12022.53, subdivision (e) enhancements. We reject defendants' remaining contentions and otherwise affirm the judgments.

## FACTS[2]

The parties stipulated that around January 2003, the victim and his friend, who was a drug dealer and was living at the victim's home at the time, went to the home of Dodd Street gang member Jason Lucero (hereinafter, Jason) so the victim's friend could complete a drug deal with Jason. Instead, Jason robbed the victim's friend. On March 1, 2003, Jason and two fellow Dodd Street gang members entered the victim's home and shot at the victim and his friend. In the gun battle that ensued, the victim shot Jason four times, but he survived. The victim's friend chased the three, firing several shots. The three gang members were tried for attempted murder of both men. The victim's friend

---

[2] In his statement of facts, appellate counsel for Lucero makes several references to Uribe as "Rubio."

When, as here, a party challenges the sufficiency of the evidence to support the verdicts, it is incumbent upon the party to set forth the facts that support them, and not just a selective reading of the record that supports the party's position. (*Green v. Green* (1963) 215 Cal.App.2d 31.) Appellate counsel for Lucero fails to abide by this rule in his statement of facts. His statement is lengthy, but conveniently omits many of the facts supportive of the verdicts. Additionally, it is unhelpful to this court for appellate counsel for Lucero to cite one page of the record in a paragraph that contains a number of different statements of fact that are supported by numerous pages of the this very lengthy transcript.

Because we must resolve factual conflicts in support of the verdicts and findings, we present a summary of the evidence that is consistent with this standard. (*People v. Holt* (1997) 15 Cal.4th 619, 667, 668.) Therefore, for the most part, we have omitted evidence that would impeach or contradict the evidence that supports the verdicts and findings.

also was charged with attempted murder, pled guilty and was sentenced to prison. At the trial of the three gang members, in 2004, the victim testified against all three and they were convicted. The victim's mother and his sister testified at the instant trial that the victim did this even though he was very scared. Jason was sentenced to prison for 57 years to life and the other two also received prison sentences. Jason's gang moniker was "Hubcaps" and he is the father of defendant Lucero. The victim's sister testified that after the 2003 incident, the victim left the area and lived with his aunt in Los Angeles County for one year and with his father in the mountains for another six months.

The Mira Loma ranch property where the crimes occurred consisted of a house, trailer and several other structures. The trailer was a place where people bought, sold and used drugs. Lindsey, the granddaughter of the ranch's owners, lived in the trailer and used and sold drugs there. Lucero and Uribe were friends of Lindsey's and, together, would visit her at the trailer, and use drugs there, as did many others.

By the time of the crimes, the victim, who was also a friend of Lindsey's, was only an occasional visitor to the ranch. His mother testified that he stopped going to the ranch altogether for one to two years after his testimony in the 2003 case. She and others testified that thereafter, he would always call and make sure Lindsey was there before going to the ranch. Lindsey testified that she was concerned about him being at the ranch when Lucero and Uribe were there, due to his testimony in Lucero's father's trial. Therefore, when they were at the ranch and the victim called to come over, she would offer to come to where he was or she would tell him it was not a good time to come over and he "would get the hint." Lindsey told a law enforcement officer that on two

4

occasions, the victim was at the ranch when Lucero and Uribe were there and things were "tense." During those occasions, she escorted the victim off the ranch for his safety and Lucero and Uribe asked her if the victim was "David" (the victim's first name). It was after that that the victim called before each time he came to the ranch. She said that she last saw Lucero and Uribe together two and one-half days before the shooting when Lucero was released from juvenile detention. The victim's sister, who also used drugs, testified that between September 2005 and February 2006, she went to the ranch four times a week, inter alia, to make sure the victim was not there when others were there. The victim sold marijuana, methamphetamine and ecstasy and he used methamphetamine.

The victim's sister testified that at some point before the shooting, she had gone to the ranch to pick the victim up and had run into Lucero, who stared at the victim. She asked Lucero what he was doing there and at whom he was staring. She told Lucero that she had been at Lucero's grandfather's funeral, because there was no reason for Lucero to be after the victim or to be staring at him, and she wanted to give the victim a chance to get away, which he did. She also testified that a few weeks before the shooting, she ran into Uribe in Lindsey's bedroom. Uribe told her, not in a mean way, not to bring the victim to the ranch. When she related this to the victim, he said that he calls first before he goes to the ranch and that everything was okay.

The evening of February 17, 2006, the victim and a male companion arrived at the ranch after the victim had made a phone call, during which he told the person he was speaking to that he was going to go and "they'd be there."[3] The victim's companion expressed concern about the victim being at the ranch due to the 2003 case, but the victim said it would be "cool." According to the companion, he and the victim approached the trailer, three men[4] came out and the victim said, "Let's go. We're leaving. It isn't cool."[5] Both ran, then the companion heard shots ring out.

Karla, the girlfriend of a man who was staying at the ranch at the time, and a methamphetamine user, testified that shortly before the shooting, she went into the trailer and sat on a folding chair in Lindsey's bedroom. She heard the gate through which cars entered the ranch property open and saw two Hispanic men, one approximately five feet, five inches tall and the other about six feet tall approach and enter the trailer. She identified them at trial as Lucero and Uribe. The phone rang, she answered it, the caller asked for Lindsey, and Karla indicated that Lindsey was not there and hung up. Then, seven more men, who said they were from Mira Loma, including a man called "Lucky,"

---

[3] During an interview with the police, the companion said that the victim had said during the call, "I'll be there in a minute" and they arrived at the ranch shortly thereafter.

[4] During an interview with the police, the companion said that the men were Hispanic. The companion also said that he did not want to testify in this case for fear that what happened to the victim would happen to him.

[5] During an interview with the police, the companion said that the victim stuck his head into the trailer, turned around and said to him, "We need to get out of here."

6

came into Lindsey's bedroom.  Lucky introduced the others in the room as his "killers."[6]

He said he was from Mira Loma, which, to Karla, meant that he was a gang member.

Dodd Street was mentioned one or two times.  The victim's sister was a topic of

conversation and Karla was asked, since she knew the sister, if she also knew the victim.

She felt they were fishing for information about the victim.  Karla said she did not know

that the victim was the sister's brother.  Lucero, Uribe and Lucky said that he was.  A

second call came on Lindsey's phone and Lucero picked it up and spoke briefly to the

caller.  Lucero seemed agitated and he moved around.  Lindsey's phone rang for a third

time and Lucero picked it up, but Uribe snatched it from him.  The caller asked for

Lindsey and Uribe said that she was in the house.  The caller asked if it was cool to come

by.  Uribe said it was and he added that there was nobody there.  Uribe then held the

phone up to Karla and told her to tell the caller that it was cool to come by, which she

did.[7]  Karla was told that the caller was someone she used to date, but she did not believe

this.  Thereafter, Uribe looked more serious than he had before.  Between 5 and 15

minutes after this call, Karla saw the victim's sister's car pull into the driveway and

someone said that they heard the gate open.  One of the men looked out the sliding glass

door of the trailer and said, "Yes, yes, yes.  Someone's here.  Someone's here."  Someone

---

[6] An investigator testified that Karla told him a year after the shooting that it was Lucero who said that the others in the room were his "killers."

[7] Karla later testified that she could not remember if it was Lucero or Clever who did this.

7

(but not Lucero or Uribe) asked what kind of car had arrived and was told what kind it was. A few minutes later, the sliding glass door of the trailer opened and the victim walked in with someone behind him. When the victim entered the trailer, all the men were in Lindsey's bedroom, except for Lucero, who was in the day room adjacent to the sliding glass door, next to Lindsey's bedroom. The victim saw all the men in Lindsey's bedroom, then turned and left the trailer. He had an expression on his face as though he was thinking, "Whoa, maybe I shouldn't be here." The man who had arrived with the victim had turned around before the victim did. Then, Karla heard the first gunshot. The shooter wore a dark bomber jacket, but no hat, and he was the same height and build as Lucero.

When shown a photo lineup containing Lucky's picture in 2007, Karla picked out the picture as that of the shooter, saying, variously, that it looked a bit like Lucky and that it was Lucero. She wrote on the admonition form, which she received with the photo lineup, concerning her identification of the photo as Lucero, "His head came to a point as the shooter's did. [¶] . . . [¶] . . . [And] his ears stick . . . out, and the scar on his right eyebrow." She told the officer who showed her the photo lineup that Lucero had been sitting next to her on the bed before the shooting, but he had said disrespectful things to her and Lucky had told him to get up and Lucky sat in his place. She said that Uribe had sat on her other side on the bed and he was quiet. Lucero then paced around the trailer in an agitated state. Lucero wore a baseball cap which he took off and put on several times. Both Lucky and Lucero asked her about the victim's sister and Uribe asked her if the sister had a brother named David. She said that it was Uribe who answered Lindsey's

8

phone the first time it rang and she did not answer it. She also said that when the phone rang again, it was Uribe who picked it up, and Lucero who grabbed it from him and told the caller not to trip, everything was all right, no one was there, Lindsey was in the house and to just come by. Lucero handed the phone to Karla and told her to say that Lindsey was there and Karla did, adding that it was alright and that nobody was there. Lucero got back on the phone and said to the caller, "See, see." Lucero went into the dayroom. Then there was a knock on the sliding glass door and the victim walked into the trailer. He appeared to be afraid, but he tried to maintain a poker face. He turned around and walked out and began walking towards the pedestrian gate. Karla got up and stretched and looked out the window onto the porch outside the trailer's sliding glass door. She saw a left hand holding a handgun, which had been pulled from a waistband. She heard a shot, then a pause, then five more shots, while seeing the shooter's hand. She told the police that Uribe was the shooter. Karla mixed up the names of Lucero and Uribe throughout her interview.

During another interview with the police, Karla said she thought some of the men in Lindsey's bedroom with her the night of the shooting had weapons by the way they held their arms across their mid-sections. She said both that "Ras or whoever" and Uribe had asked about the victim before he arrived at the trailer. She also said that as the victim walked into the trailer, someone said, "David, David, David." She said that she then realized that the victim was the one who had been calling Lindsey's phone. She said that after the victim left the trailer, Lucero was the first one to walk out the sliding glass door, then one or two other of the men, then Uribe, like he was trying to catch the victim. They

9

all moved quickly. All the other men, except Lucky, went out the sliding glass door. She went over to the window to either stretch or to make sure there was no trouble. Through an opening in the curtain on the window, from about 10 feet away, she saw one of the men, who was the same height as Lucero, standing on the patio and saw the flash of a muzzle, then heard a clap. She said this man did not have a hat on and was wearing a tight-fitting dark jacket. The flash was on the man's left side, suggesting that he fired the gun with his left hand. She ducked down for the subsequent shots. She said that Lucero wore a "poofy" white jacket with a blue stripe that night and Uribe wore a dark or black jacket that was contoured to the body. In fact, the shooter's clothes were a closer match to Uribe's than to Lucero's. She twice declared during the interview that she saw Uribe "do it."

The victim's sister testified that the day after the shooting, she asked Karla if Lucero had shot the victim and Karla replied she had seen the shooting and the man who wore the white hooded sweatshirt was the shooter, and she seemed not to know that that was Lucero. Karla also said that Uribe was there and he had answered the phone.

Lucky, who had received use immunity for his testimony, testified that he was a member of Dodd Street before February 2006, but, thereafter, continued to associate with Dodd Street members and was "inactive." He was on and off methamphetamine. On February 17, 2006, he was with fellow Dodd Street associate, "Woody," at the home of a female. Dodd Street members Lucero, Uribe, and a man named "Goofy," as well as others, were there. Lucero had a brown-handled black revolver in his waistband which he pulled out and showed off, then returned to his waistband. Lucky told police it may

10

have been a .38-caliber and that Lucero told him he had a gun.  After 7:00 p.m., Lucky and Woody drove to the ranch in Lucky's car and Goofy followed in his car with Lucero and Uribe.  Lucky and Woody went into Lindsey's bedroom, where Karla was on the bed in the presence of three white males and there was a large bald man in the kitchen.  Lucero and Uribe stood in the day room, while Goofy was on the couch in the day room.  Lucky and Woody joined Karla on the bed.  They passed around a pipe of methamphetamine and smoked it for about 20 minutes.  Lindsey's phone in the bedroom rang and Uribe picked it up and then walked into the day room with it, where Goofy and Lucero were.  Uribe told the caller not to come there because Mira Loma was there, then had a hostile argument with the caller, during which Uribe said that he did not give a "shit,"[8] then he hung up.  After the call, Lucero and Uribe talked to each other in the day room.  Five to ten minutes after the call ended, the victim put his head in the doorway of Lindsey's bedroom, glanced around and darted out of the trailer, running.  Lucero and Uribe took off from the day room after him, with Lucero in the lead.  Lucky then heard gunshots.[9]  Everyone else got up and ran out of the trailer, with Lucky headed in the same direction as Lucero and Uribe, which was towards where they had parked their cars.  Lucero and Uribe had gone out of the trailer first, two-to-three feet apart from each other.

---

[8]  This is what Lucky told the police.

[9]  He testified that before the shots rang out, Karla had been lying on the bed.  When the shots were fired, she was still on the bed.  He did not see her get up and look out the window.

11

There was a big space, then Goofy went out next, 10 feet behind Lucero and Uribe, then Lucky and Woody. When the shots went off, Lucero and Uribe were already out of the trailer and all the shots had been fired before Lucky got out. Lucky ran to his truck and, ahead of him, Goofy, Lucero and Uribe were already getting into Goofy's car. Halfway to Woody's house, Uribe called Woody's cell phone and Lucky then drove to Uribe's house, picked him up and drove him to his grandmother's house. Uribe was very scared.

Woody, who also had use immunity and a methamphetamine habit, testified that he was a former member of Dodd Street. He knew Lucero and Uribe. On February 17, 2006, he, Lucky, Lucero, Uribe, Goofy and perhaps another member of Dodd Street visited the home of the same female Lucky had mentioned in his testimony. While there, he saw a brown-handled black revolver that was either a .357 caliber or a .38 caliber being shown off by some, including Lucero, who had the gun first and last. Woody also had a gun—a .38 semiautomatic, but no one else there knew about it. Lindsey came by at some point and told them that it was alright for them to go to the ranch later—that she had drugs there. After dark, Woody left with Lucky in Lucky's vehicle and went to the ranch. Goofy drove Lucero, Uribe and everyone else present who did not live at the female's house to the ranch. All went into the trailer. Woody sat on Lindsey's bed, where a girl was sitting. Lucky also got on the bed. Goofy sat in a chair in the bedroom, while Lucero and Uribe stayed in the day room, talking to each other. The phone rang two different times, but Woody did not remember anyone answering it. When it rang the third time, the phone got passed to Uribe, who was in the day room with Lucero, and Uribe answered it. It sounded to Woody like the caller was asking who was there.

12

Someone said, "There's nothing but a bunch of Dodd Streeters here. That's who's over here if you plan on coming over here. [¶] . . . [¶] . . . You can come if you want to." Lucero and Uribe talked to each other after the call. Then the victim either came in or poked his head into the bedroom, looked around at the people in there, and went outside. He looked like he did not expect to see who he saw. Two to three seconds later, Lucero and Uribe went outside the trailer from the day room, one right behind the other, and two or three seconds later, shots rang out. The victim had not closed the sliding glass door when he left, so Lucero and Uribe did not have to open it to leave. No one in the bedroom had gotten up when the victim poked his head in or when the first shot had been fired and no one else moved during this time. No one had entered the day room except Lucero and Uribe. No one besides Lucero and Uribe left the trailer until the last shot had been fired.[10] Lucky left the bedroom first, then Woody, then the rest. After the last shot had been fired, Lucky went out of the trailer. As Woody ran to Lucky's vehicle, he threw his gun across the street, and retrieved it a few days later.

The victim's sister testified that she and her mother went to the ranch after receiving a call that the victim had been shot, but they were not allowed onto the property by the police. The mother went to the hospital where the victim had been taken, dropping the sister off at their home so the sister's boyfriend could drive her to the hospital. The

---

[10] Woody admitted that he lied to the police when he said that he was outside by the cars when the shooting started. He testified that he was scared to say where he was at the time.

sister arrived at the hospital at 1:45 or 2:00 a.m. on the 18th. During the detective's interview of the victim in the emergency room, after the victim mentioned DK (a party/tagging crew), and the sister told the victim she did not know who that was, the victim told her to look in his high school yearbook[11] and ask his friend, Daniel.[12] She told the detective that "Clever" was the one who had told her previously not to have her brother, presumably, at the ranch. She identified "Clever" to the detective as having the same first name as Uribe's. Afterward, she told the detective that the only person she could think of would be "Clever" because that's the name the victim had given her. She also testified that the police asked her if "Raskal" had shot the victim and she asked them if he had in reply. However, she added that she probably said, "It's Raskal" four times.[13] The police then told her that they had asked the victim if the shooter was "Raskal" and he had said that it was not, and she responded, "No, his name is Raskal. His name is little Raskal." According to the detective, after he reiterated that the victim had said it was not Lucero, she said, "Then it was Clever." She added that Clever had been hanging out with

---

[11] The victim and Uribe had attended the same high school.

[12] This statement was impeached by the playing of a recording of that portion of the interview in which the sister volunteered the name "Clever" and the victim replied, "Yes, it's Clever."

[13] According to the detective, this occurred before the sister went into the emergency room and participated in the detective's interview of the victim. The detective testified that her statements were made in response to his assertion that the victim had told him at the shooting scene that Lucero was not the shooter.

14

Lucero since being released from juvenile custody two days before the shooting. She also testified that at some point, when the police had told her that the victim had said that the shooter was from DK, but now he's with Dodd Street, she had responded, "That's Raskal."[14] She also had said that the victim did not get along with DK when he was younger, so the only person she could think of would be Raskal.[15]

The victim made several statements before he died. A detective testified that at the scene of the shooting, he asked the victim who shot him and the victim kept saying, "Hubcaps," but the detective knew the victim could not be referring to Jason because the latter was in prison, so he assumed it had something to do with Jason. The detective asked the victim if Lucero did it and the victim said no, but the detective was unsure whether the victim meant that Lucero was not the shooter. The detective rode in the

---

[14] According to the detective, this occurred before the sister went into the emergency room and participated in the detective's interview of the victim.

[15] For the sake of the reader, according to the transcript of a portion of a tape that was not played for the jury, during the discussion between the sister and the detective before they went into the emergency room to talk to the victim, the sister went back and forth between Lucero and Uribe, trying to guess which one was the shooter, while attempting to incorporate the detective's assertions that the victim had said it was not Lucero, but it was someone who used to be DK, and Lucero had never been DK. It was during this back and forth that she said, "It's Raskal," four times and it was "Little Nathan" or "Little Raskal." Finally, she said she didn't know at that point who it was and she needed to find this out. Immediately thereafter, she and the detective entered the emergency room and they began talking to the victim, the recording of which was played for the jury. Unfortunately, the jury was not given this context for her conflicting statements, which left the impression that she was all over the place. She was, but she was merely guessing, having known only that the victim told the detective that Lucero was not the shooter.

15

ambulance with the victim to the hospital. The detective asked the victim again who shot him and the victim continued to say, "Hubcaps." The victim also told the detective to ask the victim's sister who had done it—that she would know his name. The detective had recorded a portion of the interview he conducted with the victim while in the ambulance and it was played for the jury. During this portion, the victim said he did not remember what name "he" (presumably the shooter) went by on the streets or where "he" lives, but he was from DK. When the victim was asked why he thought he had been shot, he said, "Hubcaps." When the detective told the victim that DK does not get along with "Hubcaps,"[16] the victim said, "'[he]'s with Mira Loma now.'" The victim elaborated that "he" was with Mira Loma now, but used to be from DK. In another recording made in the ambulance, also played for the jury, the detective said to the victim, "It was the guys from DK?" and the victim replied, "The guys from DK." The victim appeared to say that if the detective could name the members of Dodd Street, the victim could tell the detective which member it was. Another officer asked the victim at the hospital if Lucero had shot him and the officer reported back to the detective that it was not "Raskal."[17] A recording of an interview the detective had with the victim while the latter was in the

---

[16] The detective testified that to his knowledge at the time, DK, which was a party/ tagging crew, a precursor to a full gang, feuded with Mira Loma Dodd Street, a full-fledged gang.

[17] For the sake of the reader, according to Uribe's moving papers, this occurred after the victim's sister had insisted during her discussion with the detective prior to going into the emergency room and seeing the victim that Lucero must have been the shooter. Unfortunately for the jury, they were not told this.

emergency room, in the company of his sister, was also played for the jury. During that interview, the victim's sister asked the victim if he could tell her anything. In his response, the victim mentioned DK. The sister replied that she did not know who that was and the victim told her that she did. The sister said, "Clever?" and the victim said, "Yes, it's Clever" and he added, "And two other dudes . . . ." The detective asked the victim who it was besides Clever and the victim replied, "I don't know." The detective asked the victim if "Clever's" last name was Uribe and the victim said it was. The detective asked the victim if Lucero was there. The victim replied that he was not sure. After the victim said he knew who Lucero was, then he said that Lucero was there and he added that it was "Clever" for sure. When the detective asked the victim what color clothing "this guy" was wearing, the victim replied that he went to shake his hand, and the person looked at him funny, and the victim recalled that the last time he had seen this person, the person had shaken his hand. The victim added, "Then he pulled the gun. [¶] . . . [¶] I start running. [¶] . . . [¶] They shoot me." When asked if he remembered the person wearing a baseball cap, at first the victim said he did not remember, then he said "Yeah, yeah."[18] In none of the interviews whose recordings were played for the jury was the victim asked if Lucero shot him and the victim replied, "No."

---

[18] It appears, based on a follow-up question by the detective, that the victim was talking about "Clever."

The victim's sister testified that based on her belief that Lucero was involved, she asked the victim whether it was "Raskal" and he replied that it was the little one.[19]

The victim's mother testified that the victim told her at the hospital that he and his companion had gone into the trailer, after he had called there. He said he had never before had problems with the person whose hand he tried to shake at the trailer. This person crossed his arms and stood back and the victim knew something was wrong. The victim saw a gun, went out the sliding glass door and yelled for his companion to run. The victim told his mother, "They got me." When being interviewed by the District Attorney's Office the year after the shooting, the mother added that the victim had told her that after the person would not shake his hand, a bunch of guys "jumped out," then he saw a gun, turned, yelled at his companion and ran out the sliding glass door. He did not say that the person who refused to shake his hand was the shooter.

During an interview with the police, Uribe admitted that he knew Jason as "Hubcaps" and he knew that Jason was Lucero's father and was in prison. He also knew Lucero. He admitted having been, probably throughout high school, in DK.

Uribe's mother testified that Uribe is left handed. A deputy sheriff testified that Uribe signed documents at the jail with his left hand. Another law enforcement officer testified that Uribe is 5 feet 11 inches or 6 feet tall. Lucero is 5 feet 6 inches or 5 feet 7

---

**19** This appears to be an unrecorded either portion of the detective's interview with the victim during which the sister was present or a conversation between the victim and the sister.

inches tall.  Lucero used his right hand to sign documents.  During a search of Uribe's house, the police found a blue hoodie with an elastic bottom, a black hoodie with an elastic bottom and a black Fubu hooded coat with a drawstring bottom.  At Lucero's house, officers found a white Reebok jacket with blue stripes.  The parties stipulated that the victim had used his cell phone to call the ranch three times on February 17, 2006 and once on February 18 at 12:50 a.m.

A ballistics expert testified that the murder weapon was a .38 special or a .357 Magnum, both revolvers.

The pathologist who conducted the autopsy of the victim testified that the victim had been shot in the back twice, in the buttocks once and in the right arm once, the latter front to back.  There was possibly a fifth wound, which was a grazing one.

*Gang evidence*

Lindsey's mother, who lived with her in the trailer, testified that there were lots of gangs in the area surrounding the ranch and some of the people who visited Lindsey at the ranch may have been gang members.

Lindsey testified that she knew Uribe for a year before the shooting and she knew that Lucero and Uribe were Dodd Street gang members, with the monikers, "Raskal" and "Clever" respectively.

When shown a photograph which included himself, Goofy and others, Lucky testified that two of the people in the photograph were throwing a hand sign for Mira Loma, which means Dodd Street.  He said that Lucero and Uribe were Dodd Street members up to the day of the shooting.  He also testified that talking to the police or

19

testifying meant death in the gang, therefore, he was very afraid to testify at this trial. He added that Dodd Street tagging includes the letters "MLR."

The victim's sister, who testified that she had known members of Dodd Street since she was 11 or 12, said that Uribe had been in DK.

Woody testified that if someone cooperates with the police in a way that harms gang members, there will be consequences. He occasionally saw Dodd Street members at the ranch. He knew Lucero's moniker to be "Raskal" and Uribe's to be "Clever." He testified that "putting in work" in the gang meant committing a robbery, harming someone or doing anything, including committing crimes, to benefit the gang. This gets one status and respect in the gang. A gang member is expected to do this. Woody testified that there could be consequences if one claims to be in a gang, but is not. He said that Uribe hung out with some members of DK, which was a tagging crew. According to Woody, Lucky was a Dodd Street member in 2006, although Lucky was not a leader in the gang. He also testified that Dodd Street members wear hats with the letter "D" on them and used the letters, inter alia, "LM."

The detective testified that DK was a party crew that feuded with Dodd Street. Sometimes, full-fledged gang members join tagging or party crews before they join a gang.

A gang investigator testified that on March 5, 2005, he asked Lucero, "What about [the victim in the instant case]? I bet you would like to get him for testifying against your dad." He also testified that in May 2005, Lucero was in the company of a Dodd Street member and someone else the police had been told had been jumped into Dodd Street.

20

Lucero told the investigator that he was a member of Dodd Street and his moniker was "Raskal." Lucero has Dodd Street tattoos on the back of his neck and on his arms.[20] The investigator opined that Goofy was a Dodd Street member. During a February 2006 search of the area of the home where the investigator was told Lucero slept, papers, a VHS tape and a notebook containing references to Dodd Street and to Goofy were found. In Uribe's room in his house on March 30, 2006, a photo was found in which Uribe was making a hand sign for "L" while another person in the photo was making a hand sign for "M."[21] On a CD was written, "Clever" and other references to Dodd Street.

The parties stipulated that on March 9, 2006, when he was booked into jail on this case, Uribe said he belonged to the "Sureno"[22] gang from Mira Loma and he goes by the name "Clever." The parties also stipulated that while Uribe was being booked into jail on January 18, 2005, he was asked about his gang affiliation and he responded that he went by the name of "Clever" and he had a Mira Loma gang tattoo. In fact, in one of his booking photos, the words, "Too Clever" appeared, tattooed on the back of his neck.

---

[20] In his statement of facts, appellate counsel for Lucero refers to photos the gang expert was shown in the Reporter's Transcript at page 2281, but the expert was referring at that point to Jason's tattoos, although the exhibit list identifies them as those of yet another gang member.

[21] The prosecution's gang expert testified that this other person claimed to be a member of Dodd Street.

[22] The prosecution's gang expert testified that gang members from Bakersfield, south, are protected by the Mexican Mafia when they go to prison, while gang members from north of Bakersfied (or "Norento") are protected by Nuestra Familia.

The prosecution's gang expert testified that in 2006, there were over 150 documented members of Dodd Street. Its members were mostly Hispanic, with the exception of Lucky and Woody. Lucero was an active Dodd Street member in 2006 and he had Dodd Street tattoos on his body. Uribe was also an active member at the time of the shooting. Dodd Street graffiti showed that they were rivals with DK in 2006. One piece of grafitti also made the same reference to "Cleves" that was found in the notebook in Uribe's house. The expert said that DK started as a skaters' crew, but was getting picked on by Dodd Street, so members of the former armed themselves to defend themselves and became a gang, too. Some members of crews become members of gangs. Someone in DK could become a member of Dodd Street even though they were rivals. A female member of Dodd Street told him that Uribe was a member and had the moniker, "Clever." During the search of Lucero's house, an article about the 2003 incident involving the victim and Jason was found. Pictures taken from Lucero's home included shots of Jason. During the March 30, 2006 search of the house where Uribe lived, references to Dodd Street and Uribe's moniker, "Clever" were found.

The expert reported that a Dodd Street member was investigated for an attempted murder in the parking lot of a fast food restaurant on July 18, 2000. The victim of this crime had looked at the member the wrong way and a fight had broken out, during which the victim had been shot several times by the member. The member was charged with attempted murder and the parties stipulated that he was convicted of attempted voluntary manslaughter, with gang "enhancements." The expert also cited the attempted murder of the victim in 2003 by Jason and two other Dodd Street members, which resulted in all

22

three being convicted, which has already been discussed. In 2004, Lucky had tried to pull a rifle on the expert, along with other officers, and was shot. Uribe and another Dodd Street member were apprehended for a January 18, 2005, grand theft auto and were subsequently convicted—Uribe pleading guilty to a violation of Vehicle Code section 10851.[23] The parties stipulated that Uribe had also admitted violating that code section and evading a police officer in August 2004.

The expert opined that a person who is not in a gang, but who advertises where they are from, for example, with a tattoo, will be retaliated against by members of the gang from that area. In order to be a gang member, one has to "put in work," meaning a criminal act has to be performed. The fear people outside the gang have for members of the gang equates with respect. A gang operates on fear. Fear is necessary to allow the gang members to continue to commit crimes and to control their territory. Respect within the gang is acquired by committing crimes and acts of violence—the more violent the act, the more respect is garnered within the gang and fear of the gang by those outside it. People outside the gang who were aware of the gang committing crimes would not report them or would not testify about them because of their fear. It is common for witnesses who were once cooperative to become uncooperative due to their fear of retaliation.

---

[23] The police officer who stopped Uribe in the stolen vehicle testified that Uribe was driving and admitted he had been in the car and was in the company of two others who were identified by the prosecution's gang expert as being Dodd Street members. In his statement of facts, appellate counsel for Lucero reports that Uribe was the passenger, citing the Reporter's Transcript at page 2201, which contains no information about who drove the car.

Suspects or witnesses who talk to law enforcement are considered "snitches." If a gang member is labeled a "snitch" and goes to prison, that person will have to be in protected housing. It is common for gang membership to be intergenerational. When a gang's name has been crossed out in graffiti, the gang members retaliate. If one gang member is challenged to a fight by the member of another gang, he would have to respond or be considered a "punk" and disrespected and he would be seen as being weak and not upholding his gang's reputation, which can negatively impact the entire gang. A witness coming forward against a gang or cooperating in an investigation involving a gang would be an insult to the gang. If a gang member is threatened or shot at, he has an obligation to respond.

In response to a hypothetical question, the expert said that if someone shot at three gang members, then testified against them in court, resulting in their convictions, their gang would be insulted. A few years later, if two other members of the gang, one of whom was the son of one of the people shot at and convicted, shot and killed the person who shot at and testified against the three gang members, the shooting would benefit the gang by convincing anyone who ever contemplated testifying against a member of the gang not to do so and this would further the criminal activities of the gang.

1. *Admission of the Victim's Statements as Dying Declarations*

   a. *Standard Used by Trial Court in Ruling the Statements Were Dying Declarations*

   By the time of the hearing on the admissibility of the victim's statements, the defendants were challenging whether sufficient foundation had been laid to admit the

following:[24] that the victim told the detective's partner at the hospital that Lucero was not the shooter; that the victim told the detective and his sister in the emergency room that the shooter was, for certain, Uribe; that the victim told both of them that Lucero was there and the victim went to shake "his" (it is uncertain to whom the victim was referring, but it appears from the context, that he was referring to Lucero) hand, that person shook his hand, then pulled a gun, the victim started running, and "they" shot the victim,[25] and the victim's statements to his mother that "They got me" and that he and his companion went to the ranch after calling Lindsey's phone and it was okay, that he went to shake a guy's hand that he knew and never had problems with before, the guy crossed his arms, stepped back and did not shake the victim's hand, the victim said, "What's up" and knew that something was wrong, the victim saw a gun "and guys," the victim turned and went out

---

[24] The fact that the prosecutor, in his motion to admit the victim's statements, addressed the statements defendants *later*, at the hearing on the People's and the defendants' motions, said they were abandoning, does not mean that the defendants are not bound by that abandonment, contrary to the assertion in Uribe's reply brief. The defendants' reliance on cases holding that the failure to request a jury instruction does not constitute invited error unless it was done for a tactical reason to argue that their express abandonment of the statutory challenge to some of the victim's statements cannot be viewed as such unless we find that it was done for tactical reasons is misplaced. Invited error is one thing—telling the trial court it need not determine whether the foundation has been laid for the admission of evidence, which is what the defendants did, is another thing entirely. Moreover, if, as defendants suggest, when the "true state" of the evidence later came out during the testimony of the witnesses at the hearing, prompting counsel possibly to change her mind, she should have said so, but did not.

[25] This statement differed from the one introduced at trial.

the sliding glass door and ran yelling to his companion to run and, that at some point, "more guys jump out."

At the beginning of the hearing on the admissibility of the victim's statements as dying declarations, the trial court said, concerning evidence showing the victim's state of mind at the time of his statements, "[T]he [c]ourt understands its burden . . . is to decide whether there is sufficient credible evidence to sustain a finding that the existence of the preliminary fact has been proven. . . .  [¶]  . . .  [¶]  But perhaps I'm confused.  Is it [Uribe's attorney's] understanding that I'm to make the finding as to whether that preliminary fact exists?  Or whether I am simply to determine whether there is sufficient evidence from which the jury could decide that that state of mind exists?"  Uribe's counsel responded, " . . . I believe the [c]ourt has to make a preliminary determination whether there's sufficient credible evidence at this point . . . *to allow the jury to hear the evidence or not*."

At the conclusion of the evidentiary portion of the hearing, the trial court made the following tentative ruling, " . . . [T]he foundation[,] in terms of the sense of immediately impending death, I think that that foundation has been laid.  I think that a reasonable finder of fact could find beyond a reasonable doubt that [the victim] . . . feared that he was going to die and die immediately. . . .  [The court went on to cite evidence which it felt demonstrated this.]  [¶]  . . .  [¶]  And so the [c]ourt's intention would be to find that the foundational facts under the dying declaration exception to the hearsay rule have been established for purposes of submitting that issue to the jury."  When Uribe's attorney asserted that the fact that the victim told his mother that the doctor had told him that he

26

would be a paraplegic meant that he understood that he was not going to die, the court said that the victim may have been told that he was going to be a paraplegic and would not die, that he might die and would, at best, be a paraplegic, or he did not believe anything he was told and thought he was going to die. The trial court pointed to evidence suggesting that the victim believed he was going to die. It then said to Uribe's counsel, "I think that a reasonable finder of fact could conclude, as you did, that there was no . . . sense of impending death, but I think that a reasonable finder of fact could also decide, based on the other statements that were made, that he still was under a sense of impending death." Uribe's counsel argued that the victim being told that he was not going to die, or that he might die or him not believing whatever he was told and thinking he was going to die was not tantamount to a sense of impending death, therefore, there was an insufficient foundation to admit his statements to his mother as dying declarations. Counsel asserted that the victim had to have been told that he was going to die or he had to say to himself that he was going to die. She added, " . . . [The victim] was told that he's going to be paraplegic. That's a very different diagnosis than[,] '[Y]ou have cancer and you have two days or two weeks.' [¶] That's a very different diagnosis. 'You are going to be a paraplegic. You are going to live, but you are not going to be able to use your lower body.' That is a very different type of diagnosis than a diagnosis saying, 'Yes, you are going to die.'" The trial court responded, "I understand. But the diagnosis is one thing. How . . . the [victim] reacts to that diagnosis is another. [¶] You are asking the [c]ourt to say that no reasonable finder of fact would find, based on the evidence that we have heard so far, that the victim . . . had this impending sense of

27

immediate death. And I think that when all the facts are looked at in totality, the circumstances are ambiguous enough that the jury very well could find he had the requisite sense of impending death. [¶] Is it a given that they would do that? [¶] No. [¶] Are there arguments to be made as to why they shouldn't? [¶] Of course. [¶] But is the evidence sufficient to let the jury make that determination? [¶] I think it is." The trial court then overruled Uribe's foundational objections to all the victim's statements.

The defendants here contend that the trial court abused its discretion in ruling that the above-described statements were admissible as dying declarations because it applied an erroneous standard. They assert that the trial court "believed that it was required only to make a threshold determination whether there was sufficient evidence from which a rational jury could conclude that the foundational requirements were met, rather than make a conclusive determination itself whether those requirements were in fact met." In fact, the trial court must itself determine the existence of foundational facts for the admission of a dying declaration rather than merely determining that a rational jury could find those foundational facts, admitting the declaration, then instructing the jury to independently determine whether the foundational facts were established before considering the declaration as evidence. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 966, fn. 13.) We note that these jurors were never instructed to independently determine whether the foundational facts of the victim's statements had been established to their satisfaction and to disregard the declarations if they had not been. We further note that evidence of the circumstances of the declarations, specifically, the victim's physical state and things he said contemporaneously which suggested whether he believed he was about

28

to die, were introduced at trial, without relevancy objections from either defendant. Finally, we note that the jury was instructed as to eyewitness testimony identifying the defendants that in addition to considering the credibility factors that applied to all witnesses, including bias, the jury should also consider, inter alia, whether the witness was under stress when identifying the defendant or whether there were any other circumstances affecting the witness's ability to make an identification. As the People correctly note, the weight of a dying declaration is for the jury (*People v. Smith* (1989) 214 Cal.App.3d 904, 913) and an argument could have been made that defendant did not really believe he was dying, therefore, the statements were unreliable.

Contrary to defendants' assertions, the trial court's remarks, up to the last set, indicate that it was aware of its proper role in determining the admissibility of the victim's statements. The last set of remarks, however, gives us pause. If this were the only remarks the trial court made, we would be inclined to agree with defendants. However, it was not. At this point, we are being called upon to divine the trial court's meaning with regards to this last set of remarks, not in isolation, but in combination with its earlier remarks. Unfortunately for defendants, the burden is on them to convince us that, despite its earlier correct pronouncement, the trial court suddenly misunderstood its duty. They do not persuade us. We believe that what the trial court meant in making the last set of remarks was that either defendant was free to argue to the jury that the victim did not have a strong sense that he was going to die at the time that he made his statements, therefore, those statements lacked trustworthiness and should not be relied on by the jury. Neither defendant made such an argument because each found support for

29

their position in various statements by the victim. However, the trial court had no way of knowing this at the time of its ruling, and it correctly stated that such an argument was possible.

    *b. Abuse of Discretion in Finding the Foundational Facts Had Been Established*

    A report of shots at the ranch was made at 1:01 a.m.

    The first police officer to arrive at the scene of the shooting testified that when he first encountered the victim, the latter was lying face down. He appeared to have been shot multiple times in the back. The victim was not responsive and his breathing was shallow. He did not look good and the officer called the paramedics.

    The detective's partner testified that at the scene of the shooting, the victim was in pretty serious condition and he had a significant amount of blood on him. The partner spoke to the victim about 1:30 a.m. in the emergency room at the hospital. The victim continued to be in serious condition and appeared to be very frightened and his voice quivered. The victim was being treated by the medical staff and appeared to be responsive to them. He was coherent. The victim had two gunshot wounds to his back and possibly an exit wound to his pelvis, one to his arm and one to his buttocks.

    The detective testified that he got to the ranch at 1:15 a.m. Paramedics were already working on the victim. The victim looked pretty bad and had an oxygen mask on his face. The victim was grumbling, thrashing, gasping and twitching. He had trouble speaking. He was bleeding from his upper torso. While he was in the ambulance, the victim got worse. He was lapsing in and out of consciousness and was having trouble breathing. The victim asked the detective to tell his parents and his sister that he loved

30

them.  He asked if he was going to make it.  The paramedic responded that if it was up to him, the victim would and he could tell his family, himself, that he loved them.  As they pulled up to the hospital, around 1:30 a.m. the victim said he could barely breathe.  In the emergency room, the victim was in extreme pain.  From the time the victim was in the ambulance to the time the detective left him in the emergency room, the victim was having difficulty keeping his eyes open and breathing.  The victim had an oxygen mask on the entire time he was in the emergency room.  The detective spoke to the victim's sister about an hour after he and the victim arrived at the hospital and they spoke for about 15 or 20 minutes.  Then both went into the emergency room to speak to the victim.  Two hours or less elapsed between the departure of the ambulance from the scene of the shooting and the end of the detective's contact with the victim at the hospital.[26]

The victim's sister testified that she talked to the victim in the emergency room at about 1:30 a.m.  The victim looked awful and had tubes going in him and blood seeping through his bandages.  He had a little difficulty speaking, but was coherent.  He was scared for his life.  The victim told his sister "'I love you, bye'" even though she was not leaving.

---

[26] In Uribe's reply brief, defendants cite to a portion of the conversation between the sister and the detective that was not introduced in evidence at the time of the hearing, i.e., the detective's statement to her that the victim might die.  This is not only irrelevant because it was not considered by the trial court, but the detective's statement to the sister, outside the presence of the victim, is irrelevant to the victim's state of mind.

The victim's mother testified that she saw him in the emergency room between 1:55 a.m. and 2:25 a.m. She stayed with him for 30 to 60 minutes, at which point he was taken to the critical care unit. When she first saw him, he was wearing an oxygen mask and he repeatedly yelled, "Mommy; mom, I love you; I love you, mom." He then said, "They got me, Mom" twice. He appeared to be scared. He vomited while she was in the room with him. There was blood all over the walls of the emergency room and all around the victim. He was in pain and had not had any pain-relieving medication when she talked to him. He told her that the doctor told him that he was paralyzed—there was a bullet in his spine. She kept telling him that he was going to be okay, but her statements were met with silence by him and "he just . . . seemed scared."

Recordings of the conversations between the victim and the detective were played for the trial court. A photo of the victim taken in the emergency room was shown to the trial court.

Defendants contend that the above cited evidence failed to show that he had abandoned all expectation of living and believed that death was inevitable. (See *People v. Gonzales* (1948) 87 Cal.App.2d 867, 878.) Because defendants expressly withdrew from consideration the foundation for admission of statements he made before he arrived at the hospital, we will not discuss this aspect of defendants' argument on appeal. As to the statements the victim made to the detective's partner and to his mother and to his sister and the detective, defendants assert that the victim "knew he was receiving state of the art [tertiary] care . . . [at a] teaching hospital [which was a] level II adult and pediatric facility with a trauma center" and they cite the hospital's website as the source of this

32

information.[27]  We rather doubt that the victim, a drug user and dealer, had such detailed knowledge of the hospital and appreciation for it.  We are also aware that Uribe, at trial, raised the specter of malpractice committed at this "state of the art" institution by extubating the victim perhaps before he should have been, thus actually causing his death.  Defendants also assert that the fact that the victim knew he had survived being at the scene, first without medical care, then with it, and survived the trip to the hospital, necessarily meant that he no longer abandoned all expectation of living and believed that death was inevitable.  We disagree.  The victim made no statement to this effect.  In fact his statements in the emergency room demonstrated the opposite—in particular, his calling his mother "Mommy"[28] and his telling his sister that he loved her and goodbye, when she was not leaving.  We decline defendants' invitation to speculate that the fact that a doctor had told him that he was paralyzed meant that the doctor also told him that he was going to live.  Defendants' assertion that a physician would not have told a patient who was about to die that he was paralyzed is worth considering if we are determining whether the doctor believed the victim was about to die.  But, we are not.[29]  We are

---

[27]  We note that in Uribe's reply brief, defendants reiterate the argument made at trial that this "state of the art" hospital was actually responsible for the victim's death. Defendants can't have it both ways.

[28]  Not too many grown men, especially men who have lived in the type of society kept by the victim, refer to their mother as "Mommy" unless they are in dire straits.

[29]  In Uribe's reply brief, defendants turn the argument around and assert that the victim would have thought that no physician would have told him he was paralyzed if he

*[footnote continued on next page]*

33

determining whether *the victim* believed that death was inevitable. Defendants' assertion that by the time the victim made statements to the detective and his sister he "must have known he was . . . actually getting better" is not supported by the record. Also, the fact that the victim was able to have a conversation with the detective and his sister did not mean that he no longer felt death was inevitable. Defendants point to the victim's question in the ambulance whether he was going to make it as suggestive that he had not abandoned all expectation of living. However, this is a common question asked at the scene of emergencies and is suggestive of a number of states of mind. Moreover, later, when the victim's mother attempted to reassure him about his condition, he greeted her words with silence and a look of being scared. As to the victim saying goodbye to his sister, defendants point to the trial version of the exhibit and transcript, which were not introduced at the hearing on the motion. The version that was introduced at the hearing does not contain a clear assertion by the sister that she wanted to be out of there. Even if it had, it is anybody guess whether the victim actually heard it or whether it actually "registered with him" under the circumstances. The fact that his "good bye" did not follow it immediately, as would have been natural if he heard her say it, suggested

---

*[footnote continued from previous page]*

was dying. Again, what the doctor thought and what the victim thought are two different things and to impute such reasoning to someone who had just been shot multiple times and was in excruciating pain in a chaotic situation is not reasonable.

34

otherwise.[30]  Finally, we reject defendants' argument that the nature of the wounds inflicted on the victim could not have suggested to him that death was inevitable.  He had been shot twice in the back and knew that one of the bullets was in his spine and had paralyzed him.  There is no wound, other than a head wound or chest wound, that is more suggestive of death to a layperson than a bullet to the back.

### c.  Confrontation Clause

Defendants acknowledge that in *People v. Monterroso* (2004) 34 Cal.4th 743, 764-765, and *People v. D'Arcy* (2010) 48 Cal.4th 257, 291-292, the California Supreme Court concluded that the admission of a dying declaration, whether testimonial or not, does not violate the Confrontation Clause.  They also acknowledge that this court is bound by those decisions.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  However, in order to preserve the issue for further review, they have asserted that admissions of the victim's dying declarations violated the Confrontation Clause.

---

[30]  Defendants correctly point out that at the beginning of the hearing, the prosecutor said he had made some revisions to the transcript of this conversation, a copy of which had been attached to Uribe's written motion.  However, the transcript which the trial court said would be filed does not contain this statement by the sister.  The prosecutor noted at the hearing that this transcript was correct, except it contained 29 pages that were not part of the recording played for the trial court.

As appellate counsel for Uribe pointed out during oral argument, the transcript is not the evidence—the actual recording is.  However, we mention the transcript because the transcriber was unable to hear what Uribe now contends the sister said *and our own hearing of the actual recording* lead us to the same conclusion.

2. *Insufficiency of the Evidence*

   a. *Premeditated and Deliberate Murder*

Lucero argues that there is insufficient evidence to support a finding that he premeditated and deliberated the murder of the victim based on facts mentioned by the prosecutor in his argument to the jury. While the prosecutor had an interesting view of the evidence, and chose to emphasize certain bits of evidence while not mentioning others, we are not bound by that view or his selection of facts. Rather, we look to the *entire record* to determine if it contains sufficient evidence to support such a finding. (*People v. Johnson (*1980) 26 Cal.3d 557, 570 (*Johnson*).) While noting that the *Anderson* factors (*People v. Anderson* (1968) 70 Cal.2d 15) with which Lucero occupies himself, are not determinative (*People v. Horvater* (2008) 44 Cal.4th 983, 1019), for the sake of responding to Lucero's points, we will confine ourselves to those three factors, which are pre-killing planning, motive and the manner of killing. (*Anderson*, at pp. 26-27.)

Contrary to Lucero's assertion, and notwithstanding the prosecutor's view of the evidence, we do not see the pre-killing planning activity as beginning with the victim's call to Lindsey's phone before he arrived at the ranch.[31] The planning activity began

---

[31] Lucero candidly admits that "[h]ypothetically, a group of disgruntled gang members could enter a homicide pact to kill someone the very next time they encountered the victim, regardless of when or where. With that foundation, premeditation and deliberation would be present based on a killing during a chance encounter." However, he goes on to assert that "[n]o such foundation exists in this case." This is where we part

*[footnote continued on next page]*

long before that. It manifested itself when Lucero and Uribe ran into the victim at the ranch long before the shooting and asked Lindsey if he was "David." The victim's sister testified that before the shooting, Lucero was staring at (or, as the gang expert called it "mad-dogging") the victim. She had to distract Lucero in order to have her boyfriend escort the victim safely away from Lucero. Uribe's statement to the victim's sister a few weeks before the murder not to bring the victim to the ranch could reasonably be viewed as a last ditch effort on his part to avoid what he knew was the inevitable, or at least to give the victim the choice of not being quite so cavalier. It certainly could have been construed by the jury as a forecast of what was about to happen, where it happened, from someone who helped make it happen. Unfortunately for Uribe, the victim appears to have been a cockeyed optimist who believed, despite this, that everything was going to be okay if he just called first.

Lucky and Woody both testified that at the home where they and other Dodd Street members were before going to the ranch, Lucero had and showed off a revolver, which was the same type of firearm used to kill the victim. Karla testified that before the victim arrived at the ranch, those with her, which included both defendants, asked about the victim's sister, then about the victim. She felt they were fishing for information about the victim. Both defendants informed Karla that the victim was the sister's brother,

_____

*[footnote continued from previous page]*

company with Lucero. The evidence clearly supports such an inference, as we demonstrate in this opinion.

37

indicating their familiarity with him.  According to Karla, it was Lucero who was agitated and paced around before the victim arrived at the trailer.  She testified variously that it was Lucero and that it was Uribe who picked up Lindsey's phone and answered it the second time it rang.  She testified variously that it was Lucero and it was Uribe who picked it up again the third time it rang, but the other snatched it away and told the victim that no one was there and it was cool to come by, adding those reassuring words to the victim that one of the victim's protectors, Lindsey, was there and having Karla repeat this reassurance.**32**  According to Karla, Uribe looked more serious after the call, suggesting that the dye had been cast and the two knew this was their opportunity to take the victim out.  Lucky testified that after this call, Uribe and Lucero talked to each other in the day room, which was suggestive of the same.  Woody testified that the two had been talking to each other in the day room before the call, and continued to do so after the call.  The fact that one of the men in the trailer said, "Yes, yes, yes.  Someone's here.  Someone's here" in response to the sound of the gate opening when the victim arrived suggests,

---

**32** We acknowledge Karla's inability to keep straight in her mind which of the defendants did and said these things, however, it is reasonable to infer that both participated in the answering of these calls, whether Karla confused in her mind Lucero's role and Uribe's role.

We also acknowledge that Lucky offered a very different version of this call than Karla did (and, also different from the version Woody offered) and the prosecutor argued Lucky's version to the jury.  However, the jury was free to accept Karla's version (or Woody's) and disregard Lucky's.  This is the problem with appellate counsel for Lucero relying solely on the prosecutor's version of the facts, as he argued them to the jury, as if it was the only version upon which the jury could rely.

contrary to Lucero's view of the evidence that a bunch of druggies were just sitting around getting high, that the plan to kill the victim was operational. The fact that one of the men, although not Lucero or Uribe, asked about the car that had arrived indicated that the arrival of the victim and his companion was a significant event and not something irrelevant to the drug use and hanging out that was going on inside the trailer. Also, the fact that someone said, "David, David, David" as the victim walked into the trailer showed that his arrival was anticipated and important. According to Karla, Lucero had positioned himself in the day room, where the victim would enter the trailer, after the last call. Both Karla and Lucky said that it was he who exited the trailer first in pursuit of the victim.[33] Woody said that both Uribe and Lucero followed the victim out the trailer. As the People correctly point out, there was no evidence that the victim said or did anything to provoke either defendant.

The victim's statement to his mother that the person he encountered in the trailer refused to shake his hand and stood back further suggests that the killing was planned.

By omitting most of the foregoing details from his discussion of the evidence, Lucero argues that the evidence of planning was insufficient. However, the devil is in the detail and it more than adequately supports an inference that the shooting of the victim was planned.

---

[33] Appellate counsel for Lucero refers to the victim's companion, who accompanied him to the trailer, as "Woodstock." In fact, the man was Spencer Stevens.

As to motive, we begin with the fact that Lucero was the son of the man the victim had put in prison for 57 years to life, basically, a life sentence. Now, that's motive. Add to this the fact that Lucero was a member of a gang and gangs thrive on fear, which is caused by members committing violent acts—the more violent the better—and gang members gain respect within the gang for such acts. Additionally, people who "snitch" on gang members are punished for the purpose of revenge and in order to send a message to the community to not do the same, so the gang can operate with impunity. The fact that two (not three, as Lucero asserts) years passed between the time the victim testified against Lucero's father and other Dodd Street members and this crime does not mean that his testimony was not the motive for the murder. Lucero's grandmother, who raised him, testified that he was 12 or 13 at the time of his father's trial and he did not know what was going on. Additionally, she said that he had been in three or four juvenile placements between the time of his father's trial and the time of the murder of the victim, the final one lasting a year, which may have prevented him from seeking revenge earlier. Again, the devil is in the detail—which Lucero completely ignores. Despite his misplaced optimism, the victim moved away from the home where Lucero's father and his fellow gang members had tried to kill him and lived in another county for one year and in another area for an additional six months. The victim's sister, Lindsey, and his male companion were all in fear for the victim's safety due to his testimony against Lucero's father. The victim's sister went to some lengths in an effort to save the victim from his own optimism. The fact that the people inside the trailer felt compelled to mention Dodd Street a couple of times and both Lucky and Woody said that Uribe

40

mentioned the gang to the victim when he called could be viewed as an announcement that the killing was a gang endeavor.  Before the victim's sister knew anything about the shooting, she was convinced Lucero was involved and she insisted that he was, even in the face of the victim's denials that he was the shooter.  In his dying declarations, the victim stated the reason for the shooting, i.e., Lucero's father.  He told his mother that "they" got him or shot him, as though the thing that he and his sister and friends had worried about had finally happened.  By making the gang enhancement and gang special circumstance findings and convicting Lucero of the substantive gang offense, the jury signaled their belief that the victim had been killed for the benefit of Dodd Street and the evidence certainly supported this.  By finding the special circumstance that the killing was done to retaliate for the victim's testimony against Lucero's father, the jury was indicating its belief that this was also a motivating factor.

As to the manner of killing, the victim was shot in the back multiple times, which, we have already observed, is, in the view of most people, one of the surest ways to kill someone.  Lucero asserts that the shooting was "reactive . . . not proactive."  If one believes that the victim was shot due to provocation, this would be true, but, as we have already stated, there was no evidence of provocation.  (See *People v. Thompson* (2010) 49 Cal.4th 79, 114, 115 [A close-range shooting without provocation or evidence of a struggle reasonably supports a finding of premeditation and deliberation.].)  Moreover, the evidence shows that the only thing the shooter was reacting to was the presence of the victim in a place where the shooter could get a good shot at him.  This does *not* make the manner of death *not* suggestive of premeditation and deliberation.  Lucero's argument

41

that the only manner indicative of the existence of this factor is a bullet fired at close range to the head is great if the shooter happens to get that close to the victim who is not moving. But this was not the case here. The victim turned and ran from the trailer, the defendants gave chase and the victim was shot several times in the back. (See *People v. Young* (2005) 34 Cal.4th 1149, 1180 [After the victim jumped out a window, the defendant "tracked [the victim] down when [the victim] made a desperate attempt to escape and cold-bloodedly executed him [outside]." (*Young*, at p. 1184.)].)

b. *Retaliation Special Circumstance*

The defendants contend there was insufficient evidence that retaliation for the victim's testimony against Jason (and the other two Dodd Street members) was a motive for the killing of the victim. They point out that the victim's sister never said that the victim should not come to the ranch because of his testimony. However, the victim's mother, Lindsey and the victim's companion all testified to this.

Defendants also assert that there was no circumstantial evidence that the victim was killed due to his testimony. However, the gang expert provided that circumstantial evidence—specifically, that fear instilled in witnesses allows the gang to operate with impunity and a witness testifying against a gang member would be considered an insult to the gang. His response to the hypothetical question, which incorporated the facts of this case, additionally provided a basis upon which the jury could conclude that the victim was killed because he testified against Dodd Street gang members. The defendants' argument, in their reply brief, that the killing had only a deterrent effect as to future witnesses, and, therefore, was not done for retaliation, misses the mark. The jury was not

42

called upon to assess the effect of the killing, just its motive, and its motive clearly was, at least in part, to retaliate against the victim for testifying against Dodd Street members. If, as the expert testified, the intent was that this would have a deterrent effect on future victims, this did not mean that it was not motivated by retaliation.

Finally, defendants suggest that because they might have wanted to kill the victim because he shot Jason, the jury's finding cannot be supported. However, as defendants, themselves, concede, retaliation for testimony need not be the sole or even the predominate motive for killing the victim. (*People v. Sanders* (1990) 51 Cal.3d 471, 519.) While it may well be that the defendants had the added motive of killing the victim because he had shot and wounded Jason, the jury could also reasonably infer that a motive was the victim's testimony against Jason (and the others), which ensured not only that Jason was temporarily sidelined by his wounds, but permanently taken from a life outside and with his family by a 57-years-to-life sentence.

We have already disposed of the argument that the killing of the victim could not have been motivated by his testimony because it did not follow immediately that testimony. By parity of reason, it was even farther away, chronologically, from the victim's shooting of Jason, yet the defendants insist that the latter was their motive for killing the victim.

Uribe asserts that there was no evidence that he was aware that the victim had testified against Jason. Uribe told the police that he knew Jason as "Hubcaps," he knew Jason was Lucero's father and he knew Jason was in prison. More importantly, Uribe was the one who told the victim's sister, some time before the shooting, not to let her

43

brother come to the ranch. The jury could reasonably conclude that Uribe would not have made this statement "out of the blue," but was well aware why it would not be safe for the victim to be there.

c. *Lying-in-Wait Theory of First Degree Murder and Lying-in-Wait Special Circumstance*

Defendants contend that there was insufficient evidence to support either the lying-in-wait theory of first degree murder or the lying-in-wait special circumstance.

"""The requirement of lying in wait for first degree murder . . . are 'slightly different' from the lying-in-wait special circumstance under Penal Code section 190.2, subdivision (a)(15). [Citation.] . . . We focus on the special circumstance because it contains the more stringent requirements. [Citation.] If, as we find, the evidence supports the special circumstance, it necessarily supports the theory of first degree murder. [¶] The lying-in-wait special circumstance requires 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .' [Citations.]'" [Citation.] [¶] We have explained the elements of the lying-in-wait special circumstance as follows. """The element of concealment is satisfied by a showing "'that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.'"" [Citation.]'" [Citation.] As for the watching and waiting element, the purpose of this requirement 'is to distinguish those cases in which a defendant acts

insidiously from those in which he acts out of rash impulse.  [Citation.]  This period need not continue for any particular length "'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.'"  [Citation.]  [Citation.] 'The factors of concealing murderous intent, and striking from a position of advantage and surprise, "are the hallmark of a murder by lying in wait."  [Citation.]'  [Citation.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1072-1073, fn. omitted (*Mendoza*).)

In *Mendoza*, about two weeks before the murder of a police officer, the defendant purchased a gun and ammunition.  (*Mendoza*, *supra*, 52 Cal.4th at p. 1063.)  The defendant had a gun on his person shortly before the murder.  (*Id*. at p. 1064.)  While he was walking with a male and female companion, a police car pulled up to them.  (*Ibid*.) The defendant ignored his companions' suggestion that he run rather than risk getting in trouble.  (He was on parole from CYA, a term of which he was violating by having a gun.)  (*Id*. at pp. 1063-1065.)  Despite the fact that the officer was being cordial when he accosted the group, the defendant copped an attitude and verbally challenged him.  (*Id*. at p. 1065.)  The officer told the defendant and the female to sit on the curb while the officer patted down the defendant's male companion.  (*Ibid*.)  Apparently, they did not sit, but stood near the curb.  As the officer was patting down the male, the defendant slowly moved behind the female and draped his left arm over her shoulder while leaving his right hand free.  (*Ibid*.)  He stood very close behind the female, with his chest against her back, and he leaned forward "as they moved toward the street."  (*Ibid*.)  He slowly pushed her forward, forcing her to step off the curb into the street.  He slid his hand down between himself and the small of the female's back as he continued to move her towards

45

the officer. (*Ibid*.) When they got within six or seven feet of the officer, he pushed her aside and put both arms out, with both hands holding the gun. (*Ibid*.) He took another step or two towards the officer, then, from a distance of about two and a half feet, aimed the gun at the officer's upper body and fired once, hitting the officer in the face. (*Ibid*.)

In response to the defendant's contention that there was insufficient evidence that there was a substantive period of waiting and watching, the California Supreme Court said, "Here, it may be that only a few minutes elapsed between the time [the officer] pulled up in his car and the time of the shooting. Nonetheless, a rational jury could find that [the] defendant, who was carrying a gun in knowing violation of his parole conditions, decided at or near the outset of the encounter that he would kill the officer rather than face a certain return to custody. As the trial testimony reflected, when [the officer] drove up, [the] defendant ignored the suggestions of both [his companions] to simply flee the scene. At the point [the officer] exited his car to question them, [the] defendant rudely challenged the officer, but did not panic or immediately reach for his gun and shoot. Instead, as [the officer] began a patsearch of [the male companion] after directing [the] defendant and [the female companion] to sit on the curb, [the] defendant positioned himself behind [the female companion] so that his right arm was hidden from the officer's view. He then controlled her movements in order to approach the officer without attracting attention. Once they were close enough that [the] defendant could not miss hitting [the officer] he pushed [the female companion] aside, drew his weapon, and stepped even closer to the officer before firing." (*Mendoza, supra,* 52 Cal.4th 1056, 1074, fn. omitted.)

46

In response to the defendant's contention that there was insufficient evidence of concealment of purpose and a surprise attack on an unsuspecting victim from a position of advantage, the California Supreme Court concluded, "We disagree. Although [the officer] was certainly aware of [the] defendant's physical presence, the evidence reflected that [the] defendant managed to conceal his murderous purpose so well that he took the officer completely by surprise when he fired the single deadly shot at close range. From this evidence, a rational jury could infer [the] defendant did not kill out of rash impulse, but rather in a purposeful manner that required stealth and maneuvering to gain a position of advantage over the unsuspecting officer. [Citations, fn. omitted.]" (*Mendoza*, *supra*, 52 Cal.4th at p. 1074.)

Therefore, defendants' assertion that they did not hide in the trailer and were visible immediately upon the victim's entry so that he could have, and did, immediately run away, did not mean that there was insufficient evidence that the gunman[34] acted from a position of advantage.

Defendants claim that the victim was not unsuspecting because he was wary enough to call in advance before coming to the ranch. The California Supreme Court answered the same challenge in *Mendoza* as follows, "Defendant claims that [the o]fficer . . . was not unsuspecting and not attacked from a position of advantage because [he] knew he was in a hostile environment and took protective action by conducting a

---

[34] We refer to the person who shot the victim as the gunman because the jury was unable to find unanimously that either Lucero or Uribe was the shooter.

patsearch.  We disagree.  Although [the officer] decided to take precautionary action, the police who responded to the shooting found him with his gun secured in its holster and his baton still attached to his belt.  From this evidence, a rational jury could conclude that [the] defendant took [the officer] completely by surprise." (*Mendoza*, *supra*, 52 Cal.4th at pp. 1074-1075, fn. 8.)

Karla testified that once the victim entered the trailer and saw the men in Lindsey's bedroom, he left with an expression on his face as though he was thinking, "Whoa, maybe I shouldn't be here."  Lucky testified that the victim "stuck his head in and looked around and he was gone.  He took off . . . [¶] . . . [¶] [r]unning."  Woody testified that the victim, "came in, he just looked, and then went out . . . ."  "[H]e . . . look[ed] in . . . [¶] . . . [¶] . . . [for a] couple [of] seconds at the most [and looked both ways] and saw all of us, and then just turned around and went out  [¶] . . . [¶] . . . like he wanted to get out of there quick."  He added that the victim's "facial expression was like he wasn't expecting to see us . . . .  [¶] . . . [H]e looked surprised . . . [¶] . . . like alert, kind of.  Maybe nervous kind of look on his face.  [¶] . . . [His] . . . eyes kind of opened wide."  By parity of reason with *Mendoza,* the evidence supporting a finding that the victim was unsuspecting and was attacked from a position of advantage was sufficient.

Defendants assert that the "perpetrator's stratagem of striking by surprise must involve means that put the victim in a particularly vulnerable position."  However, the defendants' efforts to lure the victim to the trailer by telling him (and having Karla reassure him) that everything was cool and okay, that nobody (presumably that would

48

harm him) was there and that Lindsey was there, put the victim in a particularly vulnerable position.

The defendants assert that no one in the trailer had a gun at the ready. They cite no authority holding that this is a requirement for a finding of a position of advantage. We see no difference between the gunman here having the gun so available that he was able to produce it and shoot the victim as the latter got a short distance from the trailer and the gunman in *Mendoza*, who pulled the gun out while inching towards the officer behind his female companion. Defendants' suggestion that the gunman must have been able to shoot the victim the moment the victim came in the trailer is not logical, and it flies in the face of the holding in *Mendoza*. Additionally, as the California Supreme Court held in *People v. Russell* (2010) 50 Cal.4th 1228, 1245, "As long as the murder is immediately preceded by lying in wait, the defendant need not strike at the first available opportunity, but may wait to maximize his position of advantage before taking the victim by surprise."

Finally, defendants claim that the victim was actually in an advantageous position as he fled the trailer. We disagree. Contrary to defendants' suggestion, it was not dark where the victim ran. Karla testified that there was a light shinning in her eyes from across the way as she looked outside onto the patio, which obscured her vision of the gunman on the porch of the trailer. She also testified that people inside the trailer, including herself, were able to describe the car in which the victim and his companion arrived which was farther away than the area where the victim was shot. She further testified that she was able to see, from inside the trailer, the victim, while being shot at,

49

go towards the gate, then turn and go towards the laundry room, where he collapsed and was found lying face-down. Lucky testified that he ran out of the trailer in the same direction the defendants had taken to get to the cars in which they had arrived. There had to have been adequate light for him to see this. In fact, an officer who arrived at the scene testified that it was not pitch dark outside. All this testimony suggested that it was not dark in the area where the victim was fired upon. Additionally, by chasing the victim, the gunman placed the victim in the position of getting shot in the back, thus making him vulnerable.

Lucero contends that the evidence was insufficient to show that from a position of advantage, the gunman made a surprise attack on the victim because when the prosecutor argued to the jury, he said that Woody had said that the victim was told on the phone, "You know what's going to happen to you if you come over." As we have already observed, there is great danger in relying on the argument of counsel, which is NOT evidence, instead of what the witness actually said. What Woody actually testified to was that Uribe told the victim, "'There's nothing but a bunch of Dodd Streeters . . . here. That's who's over here if you plan on coming over here' or something. . . . [¶] . . . [¶] . . . You could come if you want.'" When asked if the victim was told, "Basically, 'You can come if you want, but you know what's going to happen?' Woody replied, 'That's not words that came out of his mouth, but that's how I phrased it [when I told an investigator what he said].'" So, as is clear from Woody's *actual testimony*, Uribe did not tell the victim that the victim knew or had been told what was going to happen if he came to the ranch. Moreover, Woody's version of what was said to the victim was

50

contradicted by the testimony of Karla and Lucky about the phone conversation and by the testimony of the victim's companion about what the victim told him about that conversation. It was also contradicted by the victim's facial expression when he realized he had walked into a trap, as testified to by Karla, Lucky *and* Woody. The jury was free to reject Woody's version of the phone conversation and we are certainly not bound by it.[35]

Lucero's point that whatever position of advantage the gunman had was lost when the victim began running and there was no longer a surprise attack takes too technical a view of these requirements. The victim was shot within such a short time after turning and running that the advantage the gunman had continued in effect and the attack was no less a surprise to the victim, especially considering the fact that he was shot in the back. We again harken to the words of the California Supreme Court in *Russell*, quoted above.

Lucero's assertion that the "defendants made their physical presence known to [the victim] prior to his arrival [at the ranch]" is not supported by the record. There was no evidence that the victim realized that the men he had avoided following his testimony in the 2004 case, that his sister and Lindsey had gone to lengths to keep him away from, and that his companion had warned him to stay away from, were at the ranch, waiting for

_____

[35] We also note that in *People v. Livingston* (2012) 53 Cal.4th 1145, 1153, 1173 (*Livingston*), the California Supreme Court upheld a lying-in-wait special circumstance finding where the defendant and his companions had told a security guard that they were going to get him later, then, after about six hours had passed, the defendant burst into a shack where this and three other guards were sitting and fired an assault rifle, killing two of the four.

him.  In fact, the evidence was to the contrary, i.e., his statement to his companion before arriving at the ranch, in response to the companion's expression of concern over the 2004 case, that it was "cool" to go there.  Lucero's assertion that the gunman must hide behind something and launch the fatal attack while so hidden is belied by the holding in *Mendoza,* where the officer was fully aware of the presence of the defendant—he just did not know that the defendant had the means and intent to shoot him.

In what Lucero titles, "The Unwarranted Judicial Expansion of Murder by Lying-in-Wait," he proffers a series of assertions that we cannot precisely discern, but will attempt to.  First, he asserts that "The arguments of counsel apply equally to the instruction on first-degree murder by lying-in-wait."  However, he made no argument that the instructions on the lying-in-wait special circumstance were defective—just that there was insufficient evidence to support the elements of that circumstance.  Next, he asserts, "If this [c]ourt were to affirm the first-degree murder conviction on the lying-in-wait basis, it would entail an unforeseeable and unconstitutional judicial expansion of the scope of lying-in-wait."  First, as *Mendoza* explains, the requirements for a murder conviction on the theory of lying-in-wait are slightly different than those for the lying-in-wait special circumstance, but because the latter is more stringent, a conclusion that the requirements for it have been met necessarily means that the requirements for the former have also been met.  Second, if Lucero is implying that by upholding the murder conviction on the theory of lying-in-wait, which we necessarily do by concluding that there was sufficient evidence to support the lying-in-wait special circumstance, we are unconstitutionally expanding that theory, he fails to address the California Supreme

Court's holding in *Mendoza*, which guides our analysis.[36] In this regard, it seems, Lucero asserts that there was no plan to kill the victim. Although we heartily disagree with him, as explained elsewhere in this opinion, he cites no authority holding that such a "plan" is a requirement of either the lying-in-wait theory of murder or the special circumstance. As to his assertion that there was insufficient evidence of a surprise attack from a position of advantage, we have already addressed the matter.[37] Finally, Lucero brings to our attention a Ninth Circuit holding suggesting that the lying-in-wait special circumstance might be unconstitutionally overbroad. If, by this, Lucero means to make the same argument, we point out that it has been rejected by the California Supreme Court. (*Livingston*, *supra*, 53 Cal.4th at p. 1174; *People v. Lewis* (2008) 43 Cal.4th 415, 516, 517.) We are bound by California Supreme Court cases, not by decisions of the Ninth Circuit. (*Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal. 2d 450.)

---

[36] Lucero asserts, "A decision by this [c]ourt to uphold the first degree murder conviction based on lying in wait would equally constitutional an unforeseeable judicial enlargement of the lying in wait doctrine." We presume by this he means that for us to uphold the murder conviction on the theory of lying-in-wait would be an unconstitutional judicial enlargement of the lying-in-wait doctrine. We again refer him to the holding in *Mendoza*.

[37] Contrary to Lucero's assertion, our function is not to evaluate the trial court's reasons for denying the defendants' motions to acquit on the lying-in-wait special circumstance. The old rubric, "right ruling, wrong reason" (*People v. Jones* (2012) 54 Cal.4th 1, 50) explains why.

d. *Gang Substantive Offense, Enhancements and Special Circumstance*

As already stated, the jury convicted defendants of the substantive offense of actively participating in a gang, the enhancements to the murder that, 1) it was committed for the benefit of a gang and that, 2) each acted as a principal and the crime was committed for the benefit of a gang and a principal personally discharged a firearm causing death,[38] and the special circumstance that each intentionally killed the victim while being an active participant in a gang. The jury was instructed that all of these required that the gang has, as one of more of its primary activities, the commission of murder, attempted murder and vehicle theft. As to this, the jury instructions provided, "In order to qualify as a 'primary' activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group." The instructions also provided that if the jury found defendants guilty of a crime in the instant case, it may consider that crime in deciding whether one of the group's primary activities was the commission of that crime.

To summarize the testimony of the prosecution's gang expert as it relates to this issue, a Dodd Street member was convicted in July 2000 of attempted voluntary manslaughter, with gang enhancements, as a result of a "mad dogging" episode outside a fast food restaurant, after being charged with attempted murder; Jason and two other Dodd Street members had been convicted of attempting to murder the victim in 2003; in

---

[38] The People erroneously omit discussion of these enhancements in their brief.

54

2004, Lucky had tried to pull a rifle on the gang expert and other officers; in January 2005, Uribe and another gang member were apprehended in connection with Uribe driving a stolen car and the other member being a passenger in that car and Uribe plead guilty to a violation of Vehicle Code section 10851; and Uribe admitted that in 2004 he had violated that section and had evaded a police officer. In 2006, there were over 150 documented Dodd Street members. As instructed, the jury could consider the instant murder in determining if one of Dodd's Street's primary activities was murder. Neither the expert, nor any other witness, testified that Dodd Street's primary activities included murder, attempted murder or vehicle theft.

Defendants contend that the foregoing constitutes insufficient evidence to support the jury's finding that one of more of Dodd Street's primary activities was murder, attempted murder and vehicle theft. We agree.

In addressing an insufficiency of the evidence contention, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Johnson*, *supra*, 26 Cal.3d at p. 578.)

"In *People v. Gardeley* . . . [(1996)] 14 Cal.4th 605, [611, 620,] th[e] requirement [of establishing one or more primary activities] was satisfied by the testimony of a police gang expert who expressed his opinion that the primary activities of the group in question were drug dealing and witness intimidation, both . . . crimes [listed in the provisions governing the gang substantive offense, gang enhancements, and the gang special

55

circumstance].  [Citation.]  . . .  [¶]  . . .  [¶]  Evidence of past or present (i.e., acts committed at the time of the charged offenses,) conduct by gang members involving the commission of one of more of the statutorily enumerated crimes is relevant in determining the group's primary activities. . . .  [¶]  . . . Would such evidence alone be sufficient to prove the group's primary activities?  Not necessarily.  The phrase 'primary activities' . . . would necessarily exclude the *occasional commission of those crimes by the group's members*. . . .  [¶]  Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute."  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, some italics added.)

Defendants correctly point out that "[e]vidence that an individual has been arrested for an offense, without more, is not sufficient to establish that . . . a crime has been committed . . . ."  (*In re Leland D* (1990) 223 Cal.App.3d 251, 258.)  Therefore, the 2000 charge of attempted murder that resulted in a attempted voluntary manslaughter conviction is insufficient, as is Lucky's 2004 attempt to pull a rifle on police, as the evidence did not even show any basis for a conclusion that either constituted an attempted murder.  That leaves the instant murder, committed by two members, and, at best, two attempted murders committed by three members.[39]  Uribe's two convictions for

---

[39]  The stipulation read to the jury stated that the three shot at the victim and his friend and they were charged with attempted murder as to both, but there was no mention that they were convicted of attempted murder of the friend.  However, the jury could rely

*[footnote continued on next page]*

violating Vehicle Code section 10851 are not tantamount to vehicle thefts and the jury had no substantial evidence upon which to find that he stole either vehicle or that other Dodd Street members he was with during one of them had stolen the vehicle involved in that incident.[40]  Viewed in light of the only statistic offered at trial as to the number of members of Dodd Street, this does not constitute evidence that the commission of any of these crimes was one of the primary activities of this gang or that members *consistently and repeatedly* committed these three crimes.  (See *In re Alexander L.* (2007) 149 Cal.App.4th 605, 614, fn. 5 [two convictions in a gang whose members number 105 is insufficient to establish a primary activity].)

The People's reliance on *People v. Vy* (2004) 122 Cal.App.4th 1209, in support of their argument that the above-cited evidence was sufficient is misplaced.  In *Vy*, there were only six members in the gang.  (*Id*. at p. 1218.)  A gang expert testified that assaults,

---

*[footnote continued from previous page]*

on the factual statement in the stipulation that the three shot at both men to find that they had, in fact, committed attempted murder.

[40]  Defendants incorrectly assert that an exhibit showing Uribe was convicted of only a violation of Vehicle Code section 10851 in connection with the 2005 case was not introduced into evidence.  It was.

During argument to the jury, the prosecutor inappropriately meshed together the requirement of finding that the three specified crimes were among the primary activities of Dodd Street and the requirement that Dodd Street was engaged in a pattern of criminal activity.  He mentioned only the 2000 fast food restaurant shooting, which resulted in a plea to attempted voluntary manslaughter, the attempted murder of the victim by the three gang members in 2003, Uribe's "grand theft auto case" in 2005 (which was actually a conviction under Vehicle Code section 10851) and the instant murder as the crimes that established the primary activities requirement.

assaults with weapons and attempted murders were among the primary activities of the gang. (*Id*. at p. 1219.) Further, he cited a stabbing by a gang member, another stabbing that resulted in a conviction of assault with a deadly weapon and the instant stabbing, which resulted in a conviction of attempted murder, all of which occurred within three months of each other. (*Ibid.*) In upholding the jury's implied finding that one of the gang's primary activities was the commission of attempted murder and assault with a deadly weapon the appellate court concluded, "[W]e find the existence of three violent felonies by a gang *as small as* [*this one*] over less than three months to be sufficient . . . ." (*Id*. at p. 1225, italics added.)

The People's reliance on *People v. Duran* (2002) 97 Cal.App.4th 1448, is similarly flawed. In *Duran*, the gang expert testified that among the gang's primary activities were the commission of robberies, assaults with deadly weapons and narcotics sales. (*Id*. at p. 1465.) He said that the gang engaged in these crimes often, in fact, often enough to gain control of an area, and his opinion was bolstered by evidence of the instant robbery and a conviction of possessing cocaine base for sale. (*Ibid*.) Here, there was no testimony by the gang expert that murder, attempted murder and vehicle theft were among Dodd Street's primary activities or that Dodd Street members often engaged in these crimes.

Therefore, the substantive offense, special circumstance finding and two enhancements set forth above must be reversed for insufficiency of the evidence.[41]

## DISPOSITION

Defendants' convictions for violating section 186.22, subdivision (a), the enhancement true findings pursuant to section 12022.53, subdivision (e) and section 186.22, subdivision (b) and the special circumstance provided by section 190.2, subdivision (a)(22) are reversed for insufficiency of the evidence. The stayed terms for the section 186.22, subdivision (a) convictions are reversed. If the People elect not to retry defendant for the enhancements, or if the trial court determines that retrial is barred, the trial court is directed to strike the 25 years-to-life terms for the section 12022.53, subdivision (e) enhancements and the stayed terms for the section 186.22, subdivision (b) enhancements. In all other respects, the judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

RICHLI
J.

KING
J.

---

[41] Because we reverse the finding that defendants were principals and violated section 186.22, subdivision (b) and any principal personally used or discharged a firearm and caused death, we need not address defendants' contention that they should not have had their sentences enhanced for this finding.